## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**DEBORAH A. NOVOTNY**

        **Plaintiff,**

**-v-**

**REED ELSEVIER, et al.,**

        **Defendants.**

**Case No. C-3-05-424**

**Judge Thomas M. Rose**

**Magistrate Judge Sharon L. Ovington**

_____

**ENTRY AND ORDER OVERRULING NOVOTNY'S MOTION TO STRIKE (Doc. #25); GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. #22) AND TERMINATING THE CASE**

_____

This matter arises from the employment and subsequent termination of Plaintiff Deborah A. Novotny ("Novotny") by LexisNexis ("Lexis"). Lexis is a division of Defendant Reed Elsevier. Defendant Eric Roberts ("Roberts") was Novotny's immediate supervisor when her employment was terminated. Lexis and Roberts are hereninafter referred to collectively as the Defendants.

On January 14, 2005, Lexis terminated Novotny's employment. On December 15, 2005, Novotny filed the Complaint that is the subject of this litigation. Count I of Novotny's Complaint is for gender discrimination in violation of Title VII. Count II is for gender discrimination in violation of Ohio law, Ohio Rev. Code § 4112.01(A). Count III is for gender harassment in violation of Title VII. Count IV is for gender harassment in violation of Ohio law, Ohio Rev. Code § 4112.02. Count V is a *Genaro* claim against Roberts. Count VI is a Title VII claim for retaliation and Count VII is a retaliation claim brought pursuant to Ohio law. Count VIII is for violation of the Equal Pay Act, 29 U.S.C. § 206 et seq. Count IX is for intentional infliction of

emotional distress and Count X is for negligent infliction of emotional distress. Count XI is for defamation and Count XII is for violation of Ohio public policy.

Count IX for intentional infliction of emotional distress and Count X for negligent infliction of emotional distress have been dismissed pursuant to agreement by the Parties. Counts I through VII, XI and XII remain to be adjudicated.

Now before the Court is Defendants' Motion for Summary Judgment. (Doc. #22.) This Motion is now fully briefed and ripe for decision.

Also before the Court is Plaintiff's Objection To and Motion To Strike Hearsay Exhibits. (Doc. #25.) The Defendants have responded. The time for filing a reply has run with no Reply being filed. This Motion is also ripe for decision.

Novotny's Objection and Motion To Strike will first be addressed. This is followed by a factual summary, the standard of review for motions for summary judgment and an analysis of Defendants' Motion for Summary Judgment.

## I.    OBJECTION AND MOTION TO STRIKE

Novotny seeks to strike two exhibits that the Defendants submitted in support of their Motion for Summary Judgment. Both are notes taken by Lexis employees during investigations that they conducted.

One of the exhibits that Novotny seeks to strike is investigation notes submitted as an attachment to Linda Simpson's Declaration ("Simpson Decl.") dated March 20, 2007. The attachment to Simpson's Declaration was submitted under seal. Simpson's investigation notes are the pages with Bates numbers LNN 000225 through LNN 000245.

The second exhibit that Novotny seeks to strike is investigation notes generated by Mark

Bernatz ("Bernatz") that were submitted under seal as part of Exhibit 45 to Novotny's

Deposition. Bernatz's investigation notes are the pages with Bates numbers LNN 000121

through LNN 000131.

Novotny seeks to strike the two exhibits because they are inadmissible hearsay being

offered for the truth of the matter asserted and cannot be considered for purposes of summary

judgment. The Defendants respond that the two exhibits are not hearsay because they are not

being offered for the truth of the matter asserted.

Simpson's investigation notes, according to the Defendants, are being offered to

demonstrate that Lexis investigated Novotny's gender discrimination allegation, Simpson's

course of conduct during the investigation, the information relied upon by Simpson and

Simpson's state of mind and motivation in reaching her conclusion. Also, according to the

Defendants, Bernatz's investigation notes are being offered to demonstrate that complaints arose

that triggered Lexis's investigation, that Lexis investigated the complaints, Bernatz's conduct

during the course of the investigation, the information relied upon by Lexis and Lexis's state of

mind and motivation in terminating Novotny's employment.

Statements by an out-of-court declarant offered to demonstrate the state of mind and

motive of an individual are not considered hearsay. *Haughton v. Orchid Automation*, 206

F.App'x 524, 532 (6th Cir. 2006). For example, rumor testimony and notes being offered to

show what an individual had in his mind when he took an action are admissible. *Sutherland v.

Sycamore Community School District Board of Education*, 125 F.App'x 14, 22 (6th Cir. 2004).

In other examples, notes taken by an employee investigating complaints in the regular course of

her or his business activity are admissible as business records but any statements made by

witnesses contained in the notes are inadmissible for the truth of the matter asserted. *Armstrong v. Meijer, Inc.*, 40 F.Supp.2d 923, 924 (S.D.Ohio 1998), *aff'd*, 202 F.3d 267 (6th Cir. 1999); *Homan v. Trump Taj Mahal Casino*, No. Civ. A. 96-5470, 1997 WL 769405 at *5 n.1 (D.N.J. Dec. 4, 1997), *aff'd*, 178 F.3d 1279 (3d Cir. 1999).

Therefore, Simpson's notes from the interviews she conducted when investigating Novotny's gender discrimination claim are admissible to show that an investigation was conducted, Simpson's course of conduct during the investigation and Simpson's state of mind and motivation in reaching her conclusion. Likewise, Bernatz's notes from the interviews he conducted when investigating employee complaints of Novotny's expense account reporting practices are admissible to show that complaints were made, an investigation was conducted, Bernatz's course of conduct during the investigation and the information relied upon by Lexis.

Novotny does not dispute that some third party statements contained in business records may qualify as admissible non-hearsay or as an exception to hearsay in some circumstances. However, she responds that this is not one of those circumstances.

In support, Novotny first responds that these "records" and the statements of third parties contained therein are redundant and unnecessary because both Simpson and Bernatz otherwise testify that complaints were made, that they undertook investigations of those complaints and that they identified and interviewed certain employees when conducting the investigations. However, if redundancy were a reason to strike, a significant portion of submitted Rule 56 evidence would be struck.

Novotny next responds that the case law cited by the Defendants is distinguishable in application to this case. It is distinguishable, according to Novotny, because Bloebaum, not

-4-

Bernatz, was the decision maker regarding Novotny's termination. However, the cases cited by the Defendants indicate that investigation notes taken by an individual who conducted the investigation in the normal course of their business are admissible although hearsay statements are not admissible for the truth of the matter asserted. The record indicates that Simpson and Bernatz conducted the investigations in the normal course of their business assignments.

Novotny's third response is a reference to *Hall v. Hebrank*, 102 F.Supp.2d 844 (S.D.Ohio 1999), wherein this Court found that interview statements provided during an investigation were excludable as hearsay because they were offered for the truth of the matter asserted. However, *Hall* is not applicable here because the witness statements included in the investigation notes are not being offered for the truth of the matter asserted.

Novotny's final response is that Bernatz provided deposition testimony regarding his course of conduct and state of mind regarding his investigation and any third party statements in his investigation notes are, therefore, being offered for the truth of the matter asserted. However, the Defendants have indicated that Bernatz's investigation notes are not being offered for the truth of the matter asserted.

In sum, Bernatz's and Simpson's investigation notes are admissible as business records to show that there were complaints, to show that the complaints were investigated by interviewing certain employees and reviewing certain records and to show the state of mind and motivation of the investigators in reaching their conclusions. However, any hearsay statements included in the investigation notes are not admissible for the truth of the matter asserted. Therefore, Novotny's Motion To Strike the investigation notes (doc. #25) is OVERRULED.

## II.     FACTUAL SUMMARY[1]

Novotny began her employment with Lexis on August 25, 2003. (Compl. ¶ 4.) Lexis is a global supplier of information services. (Deposition of Deborah A. Novotny ("Novotny Dep.") 46 Sept. 8, 2006.)

### A.     Novotny Begins At Lexis

Novotny had been involuntarily terminated from her prior employment and was introduced to Lexis by a recruiter that Lexis was working with. (Id. 20-21.) Lexis offered compensation that was less than her previous job but Novotny accepted the position because she felt is was an "attractive opportunity" and she was impressed with the management team. (Id. 66.) Novotny wanted the opportunity to prove herself and earn a higher wage that was more comparable with the wage she had been receiving at her previous job. (Id. 63-65.)

During her employment with Lexis, Novotny held the position of Director of Process and Portfolio Management in the Global Electronic Product Development ("GEPD") Group. (Compl. ¶ 5.) After a reduction in force that occurred soon after Novotny began at Lexis, Novotny managed six or seven subordinate employees including project technical managers, consulting process engineers, contractors and administrative personnel. (Novotny Dep. 55-58.)

Novotny was responsible for ensuring that her subordinates performed at an optimum level, and she had the authority to affect the discipline, promotion and termination of these subordinates. (Id. 60-61.) Novotny was also responsible for understanding Lexis policies and for managing her subordinates in compliance with these policies. (Id. 61-62, 80-85.) Finally, she

---

[1]The facts are presented, as they must be, in a light most favorable to the Plaintiff, who is the non moving party in this instance. Novotny's factual allegations are accepted as true and all reasonable inferences drawn therefrom are viewed in a light most favorable to her.

was familiar with and understood her obligations under these policies. (Id.)

Novotny and the individuals that reported to her were responsible for maintenance and support of Lexis's product-development processes. (Id. 69-70.) This included development and maintenance of project-management systems and a performance management "metrics" program to measure how quickly the GEPD team could develop software and complete projects. (Id. 70-71.) Novotny and her team were also responsible for conducting "portfolio analysis" concerning business units' expenditures on software development and maintenance programs. (Id. 69-71.)

Novotny's manager and the individual responsible for hiring her was David Glowacki ("Glowacki"). (Deposition of David Glowacki ("Glowacki Dep.") 32 Sept. 15, 2006.) Glowacki was the Vice President of Program Office for North America and reported to Eric Roberts ("Roberts").  (Novotny Dep. 72-73;Glowacki Dep. 15.) At the time, Glowacki had three or four other direct-reports including Steve Anderson ("Anderson") who held the title of Senior Director of the Online Program Office. (Glowacki Dep. 11, 20, 94.) The position into which Novotny was hired had been vacant for some time before she began. (Id. 22-23.)

During the first months of her employment at Lexis, Novotny discussed her interest in quickly advancing from the director level to the senior director level with Glowacki. (Id. Dep. 74.) As a result of that conversation, Glowacki indicated to Novotny that an individual may be evaluated for promotion within 12 to 18 months if performance continued to be satisfactory. (Id.)

**B.     Novotny's 2003 Performance Appraisal**

Glowacki prepared Novotny's performance appraisal for the time in 2003 that Novotny worked at Lexis. (Glowacki Dep. 69-72; Novotny Dep. Ex. 13.) The performance appraisal, called a Personal Development Plan ("PDP"), is an annual review given to all Lexis employees.

(Deposition of Eric A. Roberts ("Roberts Dep.") 39-40, 89-93 Sept. 22, 2006.) Possible ratings on the PDP range from 1 to 5 with 1 as the highest and 5 as the lowest. (Glowacki Dep. 77.) A 3 rating indicates that the individual being evaluated meets expectations. (Id.) A rating above 3 is an indication that the individual is performing above average and a rating below 3 is an indication of deficiencies with areas that need work. (Id. 77-78.)

Glowacki's overall evaluation for the time Novotny worked at Lexis during 2003 was favorable resulting in a rating of "2" or "strong" or "exceeds expectations." Glowacki rated Novotny as 2 in the areas of "Team Building" and "Personal Evaluations" and noted that she was faced with multiple challenges up front in her position. (Id. 79.) However, he rated Novotny as 3 or "meets expectations" in the areas of "Interpersonal Effectiveness" and "Creativity and Innovation." (Novotny Dep. 85-97, Ex. 13; Glowacki Dep. 77, 88-90.) Glowacki noted that Novotny was sometimes perceived as "too direct" and advised that this could leave others "feeling as though she is telling them what to do versus negotiating or cooperating." (Novotny Dep. 87-88; Glowacki Dep. 81-82.) Novotny had a different perception of her performance and took issue with the 3 ratings. (Novotny Dep. 72, 97.)

As part of this PDP, Glowacki advised Novotny to work on her presentation skills. (Glowacki Dep. 84-85.) He also suggested that Novotny participate in a "360" feedback process to work on her perceived aggressiveness and inability to negotiate. (Id. 84-85.) The 360 feedback process permitted an individual to identify others, both inside and outside the organization, that were objectively queried for feedback on the individual. (Id.)

In early 2004, Novotny participated in a 360 feedback process. (Id. 105.) In addition to providing numerical survey responses, participants may provide comments. Some of the

-8-

comments Novotny received were favorable and some were not. (Id. 96-105.)

Glowacki also conducted a "skip level meeting" with Novotny's subordinates to obtain feedback directly from them. (Id. 105-07.) The responses revealed that Novotny's subordinates were glad to have a full-time leader now heading their group. (Id.)

## C.     Change In Immediate Supervisor

In mid-2004, Glowacki transferred to another division of Lexis. (Novotny Dep. 73-74.) He was not replaced and Roberts became Novotny's immediate supervisor. (Id.)

When Novotny began reporting to Roberts, other individuals that reported to Roberts included Anderson, Jacob Yanes "(Yanes"), Brad Clark ("Clark"), Graham Barbour ("Barbour"), Lysa Swartz ("Swartz") and Jill Sellers ("Sellers"). (Roberts Dep. 42; Declaration of Lysa Swartz ("Swartz Decl.") ¶ 1 Apr. 19, 2007.) Also reporting to Roberts was Judy Jett, his administrative assistant. (Roberts Dep. 191-93.) Roberts reported to Amy Bloebaum. (Novotny Dep. 74.)

Sellers was later involuntarily terminated by Lexis as part of a reduction in force. (Roberts Dep. 46-47.) Roberts recommended that her position be eliminated. (Id.)

Swartz, another female direct-report, later resigned from Lexis because of Roberts's "management" of her and the obvious lack of Roberts's support for her efforts. (Swartz Decl. ¶ 8.) Swartz had spoken with a human resource representative regarding her concerns about her relationship with Roberts, but she did not make a formal complaint. (Id. ¶ 5.) Swartz now indicates that Roberts was dismissive of her, negative in the feedback and cancelled meetings with her. (Id. ¶ 4.) Swartz also alleges that she received lower and unjustified personal appraisals from Roberts as compared to any she had received from any other supervisor. (Id. ¶ 3.)

Soon after Roberts became Novotny's direct supervisor, differences between Roberts and Novotny surfaced. Novotny found Roberts to be a more "hands-on" manager than Glowacki. (Novotny Dep. 250.) In addition, Roberts failed to copy Novotny on some of his "out of office" messages. (Id. 245-46.) The record also indicates that Novotny was not invited to a planning meeting conducted by Roberts in early 2004. (Id. 100-03.)

There is also a record of one occasion when Novotny was not included in an email invitation to a dinner held for Roberts's team. (Roberts Dep. 191-93.) Roberts assumes that Novotny's exclusion was an error by Judy Jett, his administrative assistant, who sent the email invitations. (Id.) Novotny was ultimately invited to the dinner meeting. (Novotny Dep. 239.)

On June 1, 2004, Roberts sent an email to Novotny in which he specifically requested an estimate as to when she expected to have a particular project, called a "function point analysis," completed. (Novotny Dep. 116-19, Ex. 20.) Novotny did not provide the answer. (Id.) When Roberts repeated his request, Novotny responded, "You are non-stop energy, aren't you?" but, again, did not provide an answer. (Id.)

When managers change at Lexis, the outgoing manager is encouraged to provide his or her input to the employee's Performance Development Plan ("PDP") as soon as possible. (Roberts Dep. 92.) When Glowacki left and Roberts took over as Novotny's manager, Roberts encouraged Glowacki to provide his input to Novotny's 2004 PDP which required Novotny to provide her evaluation or update first.[2] When Glowacki did not timely provide his input to Novotny's PDP, Roberts emailed Novotny asking her to provide her evaluation to Glowacki.

---

[2]Novotny's 2004 objectives did not change when Roberts took over. (Roberts Dep. 94.)

(Novotny Dep. Ex. 28.) Roberts emailed Novotny on July 22, 2004. (Id. ) Novotny responded, "I'll see what I can do." (Id.) On August 28th, Glowacki still did not have Novotny's final input. (Id.) As of November 14, 2004, Roberts had not yet received Novotny's self evaluation. (Novotny Dep. 144, 154, Ex. 34.)

**D.      Novotny's Relations With Others**

Novotny's relations with others during the time she reported to Roberts were not free of issues. During the summer of 2004, Anderson, who was Director of the Online Program Office, perceived Novotny's conduct during a meeting to be inappropriate and disruptive. (Novotny Dep. 111-16, Ex. 19.) Bloebaum observed that Novotny was not always receptive to hearing others' ideas during departmental and other group meetings. (Declaration of Amy Bloebaum ("Bloebaum Decl.") ¶ 4 Apr. 21, 2007.) Finally, Roberts received unsolicited feedback from a number of male and female employees who felt Novotny's communications were unprofessional. (Roberts Dep. 194-99, 231.)

**E.      Novotny's Individual Development Plan Modified**

Since Roberts had identified some areas upon which Novotny needed to focus, he modified her Individual Development Plan ("IDP"), a tool available to all employees to identify areas for future development. (Roberts Dep. 37, 193-99.) He revised her IDP in August of 2004 to include a new goal focused on interpersonal and effective senior management communication. (Roberts Dep. 193-99, Ex. WW.) Novotny agreed that this was an appropriate and legitimate goal. (Novotny Dep. 140.)

Roberts also recommended in the revised IDP that Novotny attend a leadership class at the Center for Creative Leadership. (Novotny Dep. 141.) Novotny had no objection to this class

and found it helpful. (Id.)

Lexis also provided Novotny with the assistance of an outside professional executive coach. (Novotny Dep. 263; Roberts Dep. 75.) Novotny made arrangements to meet the new goals within nine days. (Roberts Dep. 200-01.)

**F.    Novotny's Calendar**

In August of 2004, Roberts began to look closely at Novotny's Outlook computer calendar. (Roberts Dep. 133.) Roberts was concerned that Novotny's calendar regularly had a block of time noted as unavailable from 8:00 a.m. to 12:00 p.m. on Monday mornings and from 3:00 p.m. to 5:00 p.m. on Friday afternoons. (Roberts Dep. 131-33.) Roberts personally had not been unable to schedule a meeting with Novotny at those times. (Id. 135.)

Novotny testifies that she frequently used the blocked time to catch up or get organized for the next week's work. (Novotny Dep. 130-31.) She also testified that she traveled to Chicago on Friday and back to Dayton on Monday on an average of twice per month. (Id.) Although the time was not shown on her calendar as available, according to Novotny, her secretary knew that if there was no other time available on Novotny's calendar, the blocked times could be removed. (Id. 130.)

Novotny testifies that, to her knowledge, other male direct-reports to Roberts blocked times on their calendars and were not counseled, disciplined or reprimanded. (Affidavit of Deborah A. Novotny ("Novotny Aff.") ¶ 12 Apr. 19, 2007.) Also, Roberts acknowledged that he blocks time on his calendar to attend to paperwork or deskwork. (Roberts Dep. 121.) Roberts did not raise the unavailability issue with Novotny until December of 2004 when he directed her to remove the "unavailable" blocks from her calendar as part of a Corrective Action Plan ("CAP").

(Id. 253-54.)

### G.    Novotny's Technical Performance

In addition to issues regarding her calendar and her interpersonal skills, Roberts became concerned about Novotny's technical performance. In July of 2004, the "RPM" Project became Novotny's top priority. (Novotny Dep. 47.) The RPM project was a $1 million effort to improve budgeting and forecasting capabilities. (Id. 46-47.)

In September of 2004, an employee responsible for tracking the budget on the RPM project reported to Roberts that Novotny was not processing budget accruals in a timely manner. (Id. 171-74, Ex. 41.) On October 4, 2004, Roberts requested a formal project review on the RPM project. (Id. 147, Ex. 30.) Novotny informed Roberts in mid-October that the RPM project was on track to meet the targeted February 2005 completion date. (Id. 146.)

On November 5, 2004, Sally Cullers, a member of Novotny's team, advised Novotny that the February 2005 deadline for the RPM Project would not be met. (Id. 148.) Novotny did not report to Roberts that the project would not be completed on time. (Id. 147-53.) On November 12, 2004, Roberts again inquired about the status of the RPM Project and then learned that Novotny and her team were behind schedule. (Id. 151-54, Ex. 33.)

Sometime in October of 2004, Roberts directed Novotny to forgo a business seminar for which she had registered the previous January. (Id. 271.) Roberts told Novotny that the RPM project was behind schedule and Novotny should not attend the seminar. (Id.) Novotny had this conversation with Roberts when she returned his telephone call after she had cleared security at the airport en route to the seminar. (Id.) As a result, Novotny did not attend the seminar. Roberts also contacted Novotny regarding business via email during Thanksgiving week in 2004 and

-13-

while she was out of the office for a funeral. (Id. 238-39.)

**H.      Novotny Expresses Concerns**

Novotny testifies that she raised concerns about Roberts singling her out and scrutinizing her and her work to Bloebaum, Glowacki and Bernatz at various times between mid-2004 and December 2004. (Novotny Aff. ¶ 8.) Novotny feels that she was singled out and scrutinized while Roberts's male direct-reports were not. (Id.) She, however, did not expressly use the words "sexual discrimination" or "gender discrimination" during these discussions. (Id.) In the only specific instance of these conversations found in the record, Novotny testifies that she spoke with Glowacki about an issue she was having with Roberts. (Glowacki Dep. 158-59.) In this conversation, she mentioned something about a presentation that she was working on that Roberts edited. (Id.)

In November of 2004, Novotny proposed to Bloebaum that the reporting structure be changed so that Novotny's group would report directly to Bloebaum. (Novotny Dep. 157.) In January of 2005, Bloebaum rejected this proposal because she did not want anymore direct-reports. (Id. 157-58.) Also, sometime in November of 2004, although Novotny is not sure when, Roberts changed responsibility for the RPM project from Novotny to Anderson. (Id.)

**I.      The Corrective Action Plan**

In early December of 2004, Roberts placed Novotny on a Corrective Action Plan[3] ("CAP"). (Id. 168.) He and Bob Speary of the Human Resources Department met with Novotny on December 10, 2004, to advise her of the CAP. (Id.)

---

[3]At Lexis, the CAP is a part of a performance improvement process which includes a series of progressive coaching steps which, if unsuccessful, are followed by progressive discipline. (Novotny Dep. 168.)

Novotny's CAP indicates that she has performance issues in the areas of "interpersonal effectiveness" and "delivery of results." (Roberts Dep. Ex. LLL.) The associated action plan includes six items that Novotny was to immediately achieve. (Id.)

Novotny refused to sign the CAP. (Novotny Dep. 177.) She testifies that she refused to sign the CAP because it was too vague and subjective and failed to provide any objective measurements or end points. (Novotny Aff. ¶ 6.) She later showed the CAP to her executive coach who agreed. (Id. ¶ 7.) Novotny thought she may have been placed on the CAP because she requested to report directly to Bloebaum but admits that she has no evidence of this. (Novotny Dep. 180-81.)

**J.     Allegations of Gender Discrimination**

On December 15, 2004, Novotny sent a written response to the CAP to either Bernatz or Linda Simpson ("Simpson") in the Human Resources Department. (Novotny Dep. 178-79.) In the written response, Novotny indicates that she did not intend to sign the CAP for three reasons. One was that "it appears to be evidence of discrimination because my performance has not changed since my previous boss rated me above average for my 2003 and mid-year 2004 performance reviews." (Novotny Dep. Ex. 43.)

Simpson immediately initiated an investigation concerning Novotny's allegation of gender discrimination. (Declaration of Linda Simpson ("Simpson Decl.") ¶ 4 Mar. 20, 2007.) Simpson interviewed Novotny, Roberts and a number of other employees who had experience working with Roberts. (Id.) Simpson also looked into other facts and background information including both Roberts's and Novotny's employment and performance histories and the CAP. (Id. ¶ 5.) Simpson's investigation did not reveal any facts to suggest that Roberts treated male

-15-

and female employees differently on account of their gender. (Id. ¶ 6.) Simpson concluded that

there was no evidence of gender discrimination by Roberts against Novotny. (Id. ¶¶ 7, 10.)

Novotny testifies that she was not informed of the results of Simpson's investigation. (Novotny

Aff. ¶ 20.)

The CAP required Roberts to meet with Novotny on December 20, 2004 and weekly

beginning the week of January 3, 2005. (Roberts Dep. Ex. LLL.) The record indicates that these

meetings took place and that Novotny continued to question the subjectiveness of the CAP and

Roberts's attempts to work with her on it. (Deposition of Mark Bernatz ("Bernatz Dep.") Ex.

XXX Oct. 24, 2006.)

## K.      Expense Report Allegations and Investigation

On January 7, 2005, Bonnie Vaughn ("Vaughn"), one of Novotny's subordinates,

contacted Mark Bernatz ("Bernatz") in Human Resources to complain about Novotny. (Bernatz

Dep. 178-83; Novotny Dep. Ex. 45.) Vaughn was concerned about Novotny's handling of

expenses. (Bernatz Dep. 184.) Specifically, Vaughn reported that Novotny had asked Vaughn to

submit expenses under Vaughn's name for photographs taken by Novotny and that Novotny had

told Vaughn that she (Novotny) would then approve the expenses and Roberts would not review

them. (Novotny Dep. 197-99.) Vaughn also reported that Sally Cullers ("Cullers"), Candy Lynch

("Lynch"), Kathy Carroll and Thong Tran ("Tran") had concerns regarding Novotny. (Bernatz

Dep. 183.)

Bernatz then initiated an investigation of the concerns regarding Novotny's handling of

expense accounts. (Bernatz Dep. 183.) Bernatz interviewed the employees identified by Vaughn

as well as Rhonda Stewart. (Bernatz Dep. 183.) Bernatz also reviewed Novotny's expense

reports that had been brought to his attention by the employees that he interviewed. (Id. at 185.)

The unsealed portion of Bernatz's investigation report includes expenses for pictures from a team outing and flowers for a death in the family that were submitted by Vaughn. (Novotny Dep. 198-99, 201,Ex. 45 LNN 000144.) Novotny knew that Vaughn was submitting these expenses to Novotny for approval and so that they would not have to be submitted to Roberts for approval. (Id.)

Also included is a $500 expense report submitted by Sally Cullers for entertainment for Cardinal Point Solutions contractor welfare. (Novotny Dep. 201-02, Ex. 45 LNN 000148.) Novotny asked Cullers to submit this expense report to Novotny because Roberts probably would not have approved it. (Id.)

Also included is an expense report submitted by Cullers for "Gift Cheques" with a total value of $500 to be given to domestic contractors. (Novotny Dep. Ex. 45 LNN 000149-53.) Also included are expense reports submitted by Tran for a department luncheon for Kevin Walters, for gifts and a luncheon for Kathy Carroll and Eric Slocum and for a goodbye luncheon for Eric Slocum. (Novotny Dep. Ex. 45 LNN 000154-60.) Finally expense reports submitted by Lynch for limousine transportation for a PSO Office offsite on 10/28/04 and for a 20th anniversary celebration lunch for Jeff Wolfe are included in the unsealed documents considered by Bernatz. (Novotny Dep. Ex. 45 LNN 000161-64.)

In addition to the documents of record considered by Bernatz, Novotny brought her assistant a blank piece of letterhead from "Wright 'B' Flyer, Inc." and instructed her to type on it an invoice for $2,250. (Novotny Dep. 216-20, Ex. 45 LNN 000158.) This invoice was for an airplane ride on 10/28/04 arranged by Novotny for 15 people and included a flight coupon for

the limousine driver. (Id.)

Novotny testifies that Vaughn submitted expenses for photographs taken by Novotny and that she (Novotny) approved them. (Novotny Dep. 198-99.) Novotny also testifies that she requested one of her subordinates to submit for her review and approval, an expense report for gift certificates that she (Novotny) had given the subordinate as a wedding gift. (Novotny Dep. 221.) When the subordinate appeared uncomfortable, Novotny did not permit the subordinate to submit the expense. (Id.)

A few days before Vaughn's concerns were registered, Roberts required Novotny to provide a line itemization of phone calling card expenses incurred while Novotny was on a business trip in the last quarter of 2005. (Roberts Dep. 273-76, Ex. PPP, Ex. QQQ.) Roberts had previously been scrutinizing Novotny's cell phone bills and periodical expenses. (Roberts Dep. 193-94.)

During his investigation, Bernatz reviewed only those of Novotny's expense reports that were identified by the employees who raised the concerns. (Bernatz Dep. 185.) He did not compare the questioned expense reports to any others submitted by Novotny or to any other expense reports submitted by Novotny's peers. (Id.) He spoke with Roberts regarding this matter but not with Glowacki, Novotny's former supervisor. (Id.) Bernatz does not remember if he reached any conclusion regarding whether there was any embezzlement or theft of property or funds following his investigation. (Id. 198.) Finally, although he contacted Lexis's Legal Department, Bernatz did not notify Lexis's Internal Audit Department regarding employee embezzlement or theft as is required by Lexis policy. (Id. 196-97.)

**L.     Termination of Novotny's Employment**

-18-

On January 14, 2005, Bloebaum and Bernatz met with Novotny to discuss the expense reporting allegations. (Bernatz Dep. 235-36; Novotny Dep. 181-97, Bloebaum Decl. ¶ 7.) During this meeting, Bernatz asked Novotny about the issues raised by Vaughn and others. (Bloebaum Decl. ¶ 7, Novotny Dep. Ex. 44.) In one response, Novotny indicated that she had asked her subordinates to open her office door and turn on the lights when she was not there because she did not want Roberts to think she was not at work. (Novotny Dep. 181-97, Ex. 44.) When asked about expenses incurred while on team outings in 2004, Novotny responded that Roberts was not told about them in advance but he could have figured it out if he had closely looked at his budget. (Id.) The expenses would not be specifically identified but the total cost of these expenses would appear in the budget under a line item termed "employee welfare." (Id. 188-89.)

Bernatz's notes from the meeting indicate that Novotny said she realized that asking employees to submit her business or personal charges "was wrong and against company policy/procedure." (Novotny Dep. Ex. 44.) In her deposition, Novotny testified that she did not think she said that she realized what she did was wrong and against company policy/procedure. (Id. 182.) In a later Affidavit, Novotny avers that, "I did not admit that I violated company expense policies during that meeting or at any other point in time." (Novotny Aff. ¶ 9.) While not mentioning expenses that may have been submitted by her subordinates on her behalf, Novotny also avers that, "[t]he expense reports submitted by me were all justified and justifiable business expenses under Lexis Nexis policy." (Id. ¶ 10.)

At the end of the meeting and as a result of Lexis's investigation and what Bloebaum thought were Novotny's admissions, Bloebaum made the decision to terminate Novotny's employment because of Novotny's improper expense report practices. (Bloebaum Aff. ¶ 8.) In

-19-

her deposition, Novotny testifies that Bloebaum told her she was terminated for violating Lexis's expense policy. (Novotny Dep. 233.) Novotny also makes this allegation in her Complaint. (Compl. ¶ 27.) Novotny later submitted an Affidavit wherein she avers that she was never given an express reason for her termination by Bloebaum. (Novotny Aff. ¶ 19.)

Bloebaum testifies that she did not solicit nor receive any input from Roberts concerning her decision to discharge Novotny. (Id. ¶ 9.) This is confirmed by Roberts and Bernatz. (Roberts Dep. 268; Bernatz Dep. 187-88.)

**M.      Assignment of Novotny's Responsibilities**

When Novotny left, Clark's former responsibilities were merged with Novotny's and a new title at the director level was created for Clark. (Roberts Dep. 223.) All persons who previously reported to Novotny then reported to Clark. (Id.) Clark previously had no direct-reports. (Bernatz Dep. 233.) At the time of Bernatz's Deposition, Clark was still doing what was his and Novotny's jobs. (Id.) The analysis next turns to the standard of review for motions for summary judgment.

**III.      STANDARD OF REVIEW FOR MOTIONS FOR SUMMARY JUDGMENT**

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that

properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A

-21-

Wright & Miller, *Federal Practice and Procedure*, §2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

However, the mere existence of a scintilla of evidence in support of the non moving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the non moving party is entitled to a verdict. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not …obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c)). Having set forth the standard of review for motions for summary judgment, the analysis turns to Defendants' Motion for Summary Judgment on each of Novotny's claims.

## IV.  GENDER DISCRIMINATION PURSUANT TO TITLE VII AND OHIO LAW

Novotny alleges that the Defendants discriminated against her by allowing, causing or creating harassment against her and by failing to remedy the harassment against her. She also alleges that the Defendants discriminated against her by terminating her employment in retaliation for filing a discrimination/harassment claim. The Defendants respond that Novotny

cannot make a prima facie showing of gender discrimination in connection with her discharge or in connection with events prior to her discharge.

**A.      The Law On Gender Discrimination**

Gender discrimination claims brought pursuant to Ohio law are generally analyzed the same as Title VII claims. *Knox v. Neaton Auto Products Manufacturing, Inc.*, 375 F.3d 451, 456 (6th Cir. 2004)*; Ohio Civil Rights Commission v. Ingram*, 630 N.E.2d 669, 674 (Ohio 1994). In this case, Novotny has brought a gender discrimination claim pursuant to Title VII in Count I of her Complaint and a gender discrimination claim pursuant to Ohio Rev. Code § 4112.02(A) in Count II of her Complaint. These two claims will, therefore, be analyzed together applying the same law.

Title VII prohibits gender discrimination in employment as does Ohio Rev. Code § 4112. An employee may establish a Title VII violation either by presenting direct evidence of discrimination or by raising an inference of discrimination. *Haughton,* 206 F.App'x at 530. In this case, Novotny has not presented direct evidence of discrimination and relies on circumstantial evidence to infer discrimination. Therefore, her claim will be reviewed using the familiar *McDonnell Douglas* burden shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Under the three-step *McDonnell Douglas* analysis, Novotny must first prove a prima facie case of gender discrimination. *Michael v. Caterpillar Financial Services* Corp., ... F.3d ..., 2007 WL 2176220 at *6 (6th Cir. Jul. 31, 2007). The burden then shifts to Lexis to articulate a legitimate, non-discriminatory reason for the adverse action. *Id.* If Lexis articulates such a reason, Novotny has the burden of showing that the articulated reason is in reality a pretext to

mask gender discrimination. *Id.* Said another way, once a prima facie case has been made and the employer articulates a legitimate, non-discriminatory reason for the adverse action, the *McDonald Douglas* presumptions and burden disappear and the sole remaining issue is "discrimination *vel non.*" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-43 (2000).

To establish a prima facie case of gender discrimination, Novotny must show that (1) she was a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was treated differently from similarly situated members of the unprotected class or was replaced by someone outside the protected class. *McDonnell Douglas*, 411 U.S. at 802; *Knox*, 375 F.3d at 456.

If Novotny makes a prima facie case, she creates a presumption of discrimination which Lexis can rebut by articulating a legitimate, non-discriminatory reason for the adverse employment action. *Haughton*, 206 F.App'x at 530. This is a burden of production and not of proof, and the reason articulated by the employer does not have to be a good reason for the employer to escape liability. *Hoffman v Professional Med Team*, 394 F.3d 414, 422 (6th Cir. 2005). Instead, the reason must merely be based upon grounds not proscribed by Title VII. *Id.*

If Lexis presents a legitimate, non-discriminatory reason for the adverse employment action, Novotny has the burden of showing by a preponderance of the evidence that the legitimate, non-discriminatory reason is a pretext for discrimination. Pretext can be established by showing (1) that the proffered reason had no basis in fact; (2) that the proffered reason did not actually motivate the adverse employment action; or (3) that the proffered reason was insufficient to motivate the adverse employment action. *Haughton*, 206 F.App'x. at 531.

The first type of showing consists of evidence that the proffered basis never happened, that it is factually false. *Manzer v. Diamond Shamrock Chemicals*, 29 F.3d 1078, 1084 (6th Cir. 1994). However, where a plaintiff can establish that an employer's actions were premised on a false or incomplete set of facts, pretext is not necessarily shown. *Haughton*, 206 F.App'x 532. Where the employer honestly believes in the reason given, a plaintiff cannot demonstrate pretext "simply because [the reason] is ultimately shown to be incorrect." *Id.* (citing *Majewski v. Automatic Data Processing*, 274 F.3d 1106, 1117 (6th Cir. 2001)). The employer can establish an honest belief by showing its reasonable reliance on the particularized facts that were before it at the time the decision was made. *Id.* (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).

For the second type of showing, the plaintiff admits the factual basis underlying the employer's proffered explanation and admits that such conduct could motivate dismissal but attempts to indict the credibility of the explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the employer.  *Manzer*, 29 F.3d at 1084 In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext. *Id.* To show pretext in this fashion, the plaintiff may not rely upon her prima facie case but must instead introduce additional evidence of discrimination. *Haughton*, 206 F.App'x at 533.

The third type of showing ordinarily consists of evidence that other employees not in the protected class were not discriminated against even though they engaged in substantially identical conduct. *Id.* Inconsistency in an employer's explanation for such different treatment raises an inference of pretext that is drawn, at the summary judgment stage, in favor of the

-25-

nonmovant. *Haughton*, 206 F.App'x at 533 (citing *Seay v. Tennessee Valley Authority*, 339 F.3d 454, 468 (6th Cir. 2003)).

In their Motion for Summary Judgment, the Defendants argue that Novotny fails to state a prima facie case of gender discrimination in connection with her discharge or in connection with the actions taken by Roberts prior to her discharge. The Defendants also argue that, if Novotny could make a prima facie case of either, she cannot show that their reasons for the actions were a pretext for discrimination. Each of these arguments will be addressed seriatim.

**B.      Gender Discrimination In Connection With Discharge**

The Defendants do not challenge the first three elements of a prima facie case of gender discrimination in connection with Novotny's discharge. They argue that Novotny fails to state a prima facie case of discrimination in connection with her discharge because she cannot demonstrate that she was treated differently from similarly situated male employees or that she was replaced by someone outside the protected class.

**1.      Fourth Prima Facie Element:  Disparate Treatment**

Novotny argues that, at best, substantial evidence exists that Anderson, Yanes, Julian Ashworth ("Ashworth") and T J Casey ("Casey") were similarly situated male employees who were treated differently. To be similarly situated, Novotny and either Anderson, Yates, Ashworth or Casey "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Fouse v. Potter*, No. 06-4174, 2007 WL 1339836 at *2 (6th Cir. May 7, 2007) (quoting *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992)). Novotny need not show an exact correlation with Anderson,

-26-

Yates, Ashworth or Casey but must show similarity in all of the relevant aspects. *Knox*, 375 F.3d at 458 (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th cir. 1998)).

In this case, Novotny has not presented evidence that Anderson, Yates, Ashworth or Casey engaged in substantially the same conduct that she did with regard to expense reports. Novotny presents evidence that Glowacki admitted that he had likely violated Lexis's policy that the senior employee present at a meal should be the one to pay for and submit the expense on his or her expense report.  (Glowacki Dep. 123-24.) Further, Swartz, a former Lexis employee avers that she knows of at least two occasions at which staff paid for meals where they were not the most senior Lexis executive in attendance. (Swartz Decl. ¶ 11.) However, Swartz does not identify specifically who were the senior executives present at the meals. Finally, Bernatz testifies that, as Lexis's Human Resource Director, he had never been involved in any investigation of any concerns regarding expense reporting other than the investigation involving Novotny. (Bernatz Dep. 131-32.)

Yet, while Novotny may have identified evidence that some individuals at Lexis who violated Lexis's policy regarding expensing of meals, Novotny was discharged for expense report abuses that go well beyond the expensing of meals where a senior employee who was present did not submit the expense report for the meal. Therefore, Novotny has not presented evidence that, when viewed in a light most favorable to her, shows that employees reporting to the same supervisor violated Lexis' policy regarding the reporting of expenses to the extent that she did. She has not shown that similarly situated males were treated differently for similar expense reporting violations.

**2.    Fourth Prima Facie Element:  Replacement By Someone Outside the Protected Class**

-27-

In addition to showing that she was treated differently from similarly situated members of the unprotected class, which she has not done, Novotny may prove the fourth element of a prima facie case of gender discrimination regarding her termination by showing that she was replaced by someone outside the protected class.  "A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th cir. 2003), *cert. denied*, 541 U.S. 1010 (2004); *Barnes v. GenCorp., Inc.*, 896 F.2d, 1457, 1465 (6th Cir. 1990), *cert. denied*, 498 U.S. 878 (1990). However, a person is not replaced when another employee is assigned to perform the person's duties in addition to other duties or when the work is redistributed among other existing employees already performing related work. *Grosjean,* 349 F.3d at 336 (citing *Barnes*, 896 F.2d at 1465).

To make this showing of replacement by someone outside the protected class, Novotny identifies Clark whom she argues is a less qualified male. When Novotny's employment was terminated, Clark's former responsibilities were merged with Novotny's and a new title at the Director level was created for Clark. All persons who previously reported to Novotny then reported to Clark. Clark previously had no direct-reports.

Novotny has not shown that she was replaced by Clark as replacement is defined by the Sixth Circuit. Clark was not hired nor was he reassigned to perform only Novotny's duties. Novotny's former duties were assigned to Clark in addition to his then current duties.

In sum, Novotny has not presented evidence of a prima facie case of gender discrimination in connection with her discharge. Even if she could make a prima facie case, she cannot demonstrate that the Defendants' proffered explanation for her discharge is a pretext for discrimination.

-28-

**3.      Legitimate, Non Discriminatory Reason**

Lexis terminated Novotny's employment because of her improper expense report practices. Based upon an investigation conducted by Bernatz, Novotny's employment was terminated because a number of employees reported that Novotny had asked them to submit expense reports to her for her review on expenses that Novotny had actually incurred. Also, Novotny had been requesting reimbursement for questionable expenditures. This is a legitimate, non discriminatory reason for terminating Novotny's employment.

**4.      Pretext**

Novotny now has the burden of showing that this reason is a pretext for discrimination. Pretext can be established by showing (1) that the proffered reason had no basis in fact; (2) that the proffered reason did not actually motivate the adverse employment action; or (3) that the proffered reason was insufficient to motivate the adverse employment action.

The first type of showing consists of evidence that the proffered basis never happened, that it is factually false. In this case, no evidence has been submitted that shows that the proffered basis for Novotny's discharge never happened.

For the second type of showing, the plaintiff admits the factual basis underlying the employer's proffered explanation and admits that such conduct could motivate dismissal but attempts to indict the credibility of the explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the employer. In other words, Novonty must argue that the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that Lexis's explanation is a pretext. To show pretext in this fashion, Novotny may not rely upon her prima facie case but must instead

introduce additional evidence of discrimination. This she has not done.

The third type of showing ordinarily consists of evidence that other employees not in the protected class were not discriminated against even though they engaged in substantially identical conduct. In this case, Novotny had not presented evidence that other male employees engaged in substantially the same abuses of the expense reporting system as she did and were not terminated. Therefore, Novotny has not presented evidence that Lexis's legitimate, non discriminatory reason for terminating her employment was a pretext for discrimination. The analysis turns next to the second basis for Novotny's gender discrimination claim.

**C.      Gender Discrimination In Connection With Actions Prior To Discharge**

The Defendants argue that Novotny cannot prove the third and fourth elements of a prima facie case of gender discrimination with regard to actions they took prior to her discharge. They argue that Novotny fails to state a prima facie case because she cannot demonstrate that Lexis took an adverse employment action and because she cannot demonstrate that similarly situated members of the unprotected class were treated differently. Novotny offers no argument as to why the actions taken by Roberts prior to her discharge constitute adverse employment actions. She does, however, offer argument that similarly situated males were treated differently.

**1.      Third Prima Facie Element: Adverse Employment Action**

To be actionable in the context of a discrimination claim, an adverse employment action requires a "materially adverse change" in the terms and conditions of employment such as hiring, firing, failing to promote, reassignment or a significant change in benefits. *Freeman v. Potter*, 200 F.App'x 439, 442 (6th Cir. 2006).  Further, an adverse employment action usually "inflicts direct economic harm." *Id.*

To be adverse in the context of a discrimination claim, an action must have a "significant detrimental effect" on the employee's status, as evidenced by objective factors, not subjective impressions. *Id.* at 442-43. Finally, a "bruised ego" caused by trivial actions is not sufficient to support a claim of adverse action. *Id.* at 442.

For example, heightened scrutiny is not an adverse employment action for purposes of gender discrimination. *Howard v. Board of Education of the Memphis City Schools*, 70 F.App'x 272, 280  (6th Cir. 2003). Also, exclusion from weekly staff meetings and treating the plaintiff as a "leper" are not adverse employment actions. *Wellman v. Wheeling and Lake Erie Railway Co.*, 134 F.3d 373, 1998 WL 25005 at * 3 (6th Cir. Jan. 12, 1998). Further, assignment of difficult projects and failing to return phone calls are not adverse employment actions. *Brockman v. Snow*, 217 F.App'x 201, 206 (4th Cir. 2007). Finally, a partially unsatisfactory performance review and placement on a corrective action plan does not constitute an adverse employment action for purposes of gender discrimination. *Agnew v. BASF Corp.*, 286 F.3d 307, 309 (6th Cir. 2002).

Following are the actions prior to discharge about which Novotny complains:

Roberts allegedly excluded her from meetings, group dinners and out-of-office messages;

Roberts "arbitrarily scrutinized" or rejected her expense reports and requests for reimbursement;

Roberts cancelled or refused meetings with her;

Roberts scrutinized, modified or assumed control of her presentations;

Roberts scrutinized her vacation/out-of-office time;

Roberts "criticize[d]; demean[ed], harass[ed] and preclude[d]" her from working effectively and meeting her improvement goals;

Roberts ordered her not to attend an out-of-town seminar;

Roberts placed her on a CAP;

Bernatz, when investigating Novotny's expense report issues, did not review all of her expense reports, did not discuss the issues with her previous supervisor or all of her subordinates, did not compare her expense reports with those of anyone else and concluded the investigation in a matter of days while taking an undetermined period of time to investigate her gender discrimination claims.

None of these allegations, even if true, rise to the level of an adverse employment action. Novotny's allegations concerning cancelled or refused meetings, group dinners, out-of-office messages, directions not to attend a seminar and increased scrutiny are not materially adverse changes in the terms and conditions of her employment nor do they objectively have a detrimental effect on her status. Further, Novotny has not shown that the conduct she describes regarding Lexis's investigations is an adverse employment action. Therefore, Novotny has not demonstrated that Roberts or Lexis took an adverse employment action against her.

The analysis next turns to the fourth element of a prima facie case. Novotny must show that similarly situated male employees were treated differently than her with regard to Roberts's actions prior to her discharge. Replacement by someone outside the protected class does not apply because this allegation does not involve Novotny's termination.

**2.      Fourth Prima Facie Element: Disparate Treatment**

Novotny identifies two alleged disparate treatments with regard to Roberts's actions prior to her discharge in her opposition to the Defendants' Motion for Summary Judgment.[4] One is the

---

[4]Novotny presents arguments regarding how the two investigations were conducted as evidence of disparate treatment. However, she does not argue, nor can she, that the fact that the investigations were conducted is evidence of disparate treatment. Therefore, the conduct of the investigations is not further considered by the Court with regard to Novotny's gender discrimination claim.

Roberts scrutinized her calendar where he admittedly did not his male direct-reports. However, Novotny does not identify evidence on the record that Roberts did not scrutinize others' calendars. Further, Novotny testifies that she does not know the degree to which Roberts may have scrutinized vacation and out-of-office time for his other direct-reports. (Novotny Dep. 258-59.) She also testifies that she knows of no other direct report who routinely took Friday afternoons and Monday mornings off as she did. (Novotny Dep. 135.)

The second alleged disparate treatment is that Novotny was left out of email messages, dinner invitations for the team and was referred to outside coaching and seminars when no male members of Roberts's team had been. Yet, Novotny testifies that she does not know the basis for inviting individuals to meetings, who was invited to attend meetings or if there were meetings to which other direct-reports of Roberts were not invited. (Id. 240-41.) Also, as to the coaching and seminar activities set forth in her CAP, she offers no evidence that male direct-reports exhibited the same performance deficiencies and received a more favorable treatment.

Other possible disparate treatment allegations regarding actions taken before Novotny's termination not specifically raised by Novotny include scrutiny of her expense reports and the out-of-town seminar that Roberts told her not to attend. However, Novotny testifies that she was not privy to, and has no knowledge of, expenses submitted to Roberts by his other direct-reports or Roberts's acceptance or rejection of them. (Id. 195-96.) Also, Novotny has not identified any male employee who, with responsibility for a project as large in scope as the RPM Project that was behind in schedule, who attended such a seminar.

In sum, Novotny has not presented evidence that makes a prima facie case of gender discrimination in connection with Lexis's actions prior to her discharge. Even if she could make

a prima facie case, she cannot demonstrate that the Defendants' proffered explanation for their actions prior to her discharge are a pretext for discrimination.

**3.      Legitimate, Non Discriminatory Reason**

Lexis does not identify any direct evidence as to why Novotny was excluded from business meetings, group dinners and out-of-office messages. However, Novotny testifies that she does not know how Roberts determined who would be invited to the business meetings and does not know whether others who reported directly to Roberts were excluded. Regarding the only group dinner that was discussed, Roberts indicates that the failure to initially invite Novotny was a mistake by his secretary and Novotny was ultimately invited. Regarding the out-of-office messages, there is evidence that Roberts felt it was far less likely that something urgent would arise in Novotny's area as opposed to the areas where he sent the out-of-office messages.

Lexis also does not identify any direct evidence as to why Roberts may have scrutinized Novotny's expense reports and requests for reimbursement. The record does, however, include the Lexis expense reporting policy, an indication that supervisors were responsible for administering the policy, and evidence that Roberts was Novotny's supervisor.

With regard to alleged cancelled or refused meetings, Novotny admits that Roberts's priorities may have been different than hers. Further, she has no reason to doubt that Roberts was engaged in other business that he felt was a higher priority at the time and that he may have cancelled meetings with other direct-reports for this same reason.

With regard to presentations, Novotny testifies that Roberts wanted to edit her presentations. She concedes, however, that he wanted to say other things or highlight other

points to make a good presentation to his boss.

With regard to out-of-office time and vacation, Roberts discovered that Novotny was shown unavailable on her calendar on Friday afternoons and Monday mornings and she was traveling to seminars. He, also knew that she was behind in an important project. Roberts, therefore, began to scrutinize Novotny's out-of-office time and vacation. He even went so far as to encourage, if not order, her to avoid attending one specific seminar.

As to the scrutiny of her performance and placement in a CAP, Novotny admits that she and Roberts had different perceptions of her job performance. She had no reason to think that Roberts did not honestly believe in his perception of her job performance.

Finally, as to Lexis's investigation of Novotny's expenses, Bernatz reviewed Novotny's expense reports because he had received complaints from her employees regarding these expense reports. He investigated the expense reports related to the complaints that he received and discussed them with those who complained and with Novotny's current supervisor.

In sum, the record has provided legitimate, non discriminatory reasons for the complained-of actions taken by Lexis prior to Novotny's discharge. Novotny now has the burden of showing that these reasons are a pretext for discrimination.

**4.      Pretext**

Pretext can be established by showing (1) that the proffered reason had no basis in fact; (2) that the proffered reason did not actually motivate the adverse employment action; or (3) that the proffered reason was insufficient to motivate the adverse employment action.

The first type of showing consists of evidence that the proffered basis never happened, that it is factually false. In this case, no evidence has been identified that shows that the proffered

basis for Lexis's actions prior to Novotny's discharge never happened.

For the second type of showing, the plaintiff admits the factual basis underlying the employer's proffered explanation and admits that such conduct could motivate dismissal but attempts to indict the credibility of the explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the employer. In other words, Novotny must argue that the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that Lexis's explanation is a pretext.

To show pretext in this fashion, Novotny may not rely upon her prima facie case but must instead introduce additional evidence of discrimination. This she has not done.

The third type of showing ordinarily consists of evidence that other employees not in the protected class were not discriminated against even though they engaged in substantially identical conduct. In this case, Novotny has not presented evidence that male employees were treated differently. She presents no evidence that Roberts did not exclude male direct-reports from business meetings and out-of-office messages. She presents no evidence that Roberts did not scrutinize expense reports and requests for reimbursement submitted by male direct-reports. She presents no evidence that Roberts did not cancel or refuse meetings with other male direct-reports. She presents no evidence that Roberts did not scrutinize presentations prepared by male direct-reports. She presents no evidence that Roberts did not closely scrutinize out-of-office and vacation time of male direct-reports who were behind schedule on an important project. She presents no evidence that Roberts did not place male direct-reports whom he thought had performance problems on a CAP. Finally, she presents no evidence that Lexis did not fully investigate male peers who had violated its expense report policy to the extent that Novotny

violated that policy.

In sum, the record includes legitimate, non discriminatory reasons for the complained-of actions taken by Lexis prior to the termination of Novotny's employment. Further Novotny has not shown that these legitimate, non discriminatory reasons were a pretext for gender discrimination.

**D.     Conclusion**

There are no genuine issues of material fact and Novotny has failed to state a prima case of gender discrimination in connection with her discharge because she has not shown that she was treated differently from similarly situated individuals or that she was replaced by someone outside the protected class. Further, Lexis has articulated a legitimate, non discriminatory reason for terminating Novotny's employment and she has not shown that this reason is a pretext for discrimination.

Similarly, there is no genuine issue of material fact and Novotny has failed to state a prima facie case of gender discrimination in connection with actions taken prior to her discharge because she has not shown that Lexis took an adverse employment action or that she was treated differently from similarly situated members of the unprotected class. Further, the record includes legitimate, non discriminatory reasons for the complained-of actions taken by Lexis prior to terminating Novotny's employment and she has not shown that these reasons are a pretext for discrimination. Therefore, there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Novotny's Title VII and Ohio gender discrimination claims. Counts I and II of Novotny's Complaint are DISMISSED.

**V.     GENDER HARASSMENT UNDER TITLE VII AND OHIO LAW**

Novotny next alleges that the Defendants subjected her to a hostile and abusive conduct because of her gender. (Compl. ¶¶ 42-56.) The Defendants respond that Novotny cannot make a prima facie case of gender harassment and that Lexis exercised reasonable care to prevent and correct harassment in the workplace.

Gender harassment claims brought pursuant to Ohio law are generally analyzed the same as gender harassment claims brought pursuant to Title VII.  *Knox*, 375 F.3d at 456*; Johannes v. Monday Community Correctional Institution*, 434 F.Supp.2d 509, 520 (S.D.Ohio 2006); *Ingram*, 630 N.E.2d at 674. In this case, Novotny has brought a gender harassment claim under Title VII in Count III of her Complaint and a gender harassment claim under Ohio Rev. Code § 4112.02 in Count IV of her Complaint. These two claims will, therefore, be analyzed together.

Title VII makes it an unlawful employment practice for an employer to require an individual to work in an environment that is hostile or abusive due to discrimination based upon the individual's gender. *Satterwhite v. Faurecia Exhaust Systems, Inc.*, No. 3:02-CV-574, 2005 WL 1279253 at *13 (S.D.Ohio May 31, 2005) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). In this case, Novotny claims that she was harassed by her supervisors. She does not claim that the gender harassment was due to actions by coworkers. Therefore, to establish a prima facie case of gender harassment based upon a supervisor's actions, Novotny must show that (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the unwelcome harassment was based upon her being a member of the protected class; and (4) the harassment created a hostile work environment. *Williams v. General Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir. 1999). If a prima facie case is shown, an employer has an affirmative defense if it took reasonable care to prevent and correct any sexually harassing behavior. *Id.*

-38-

Novotny identifies no additional or independent facts to support her claim of gender harassment. Therefore, for purposes of this claim, the alleged actions that form the basis for Novotny's gender discrimination claim will be used.

The Defendants argue that there is no evidence that any of the alleged actions creating the work environment were based upon Novotny's gender, that Novotny has not established that the alleged harassment created a hostile work environment, and that, assuming that Novotny can present a prima facie case, Lexis has an affirmative defense because it exercised reasonable care to prevent and correct any alleged harassment. Each of these arguments will be addressed seriatim.

**A.      Third Prima Facie Element:  Harassment Based Upon Being a Member of a Protected Class**

The third element of a prima facie gender harassment claim that Novotny must show is that the alleged harassment was based upon her being a female. She must show that, but for the fact that she was a female, she would not have been the object of the alleged harassment. *Williams*, 187 F.3d at 565 (citing *Henson v. City of Dundee*, 862 F.2d 897, 904 (6th Cir. 1982)). However, as discussed above, Novotny has not shown that males were treated differently. She also has presented no evidence that any of the alleged harassment was sexual in nature. Therefore, she has not shown that the alleged harassment was based upon her being a female.

**B.      Fourth Prima Facie Element:  Hostile Work Environment**

The fourth element of a prima facie gender harassment claim that Novotny must show is that the alleged harassment created a hostile work environment. Whether an environment is hostile or abusive is determined by looking at all of the circumstances including the frequency of the discriminatory conduct; the severity of the discriminatory conduct; whether the

discriminatory conduct was physically threatening or humiliating, or a mere offensive utterance; and whether the discriminatory conduct interfered with an employee's work performance. *Harris*, 510 U.S. at 21. A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment is "beyond Title VII's purview" as is conduct that is not subjectively perceived by the victim to be abusive. *Id.* Finally, conduct creating a gender harassment claim need not be overtly sexual in nature, "[a]ny unequal treatment of an employee that would not occur but for the employee's gender may, if sufficiently severe or pervasive" create a hostile work environment that is in violation of Title VII. *Williams*, 187 F.3d at 565.

Thus, the conduct creating the hostile work environment is judged by both an objective and a subjective standard. *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999). The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive. *Id.* Also, the alleged victim must subjectively find the environment to be abusive. *Williams*, 187 F.3d at 566. Yet, the subjective component does not require that a victim report a hostile environment. *Id.*

While Novotny states that her work environment was subjectively hostile, the evidence does not support a finding that the work environment was objectively hostile. There is no evidence that any of the alleged conduct was physically threatening or humiliating. There is no evidence that the alleged conduct interfered with Novotny's work performance. There is no evidence that the alleged conduct altered her conditions of employment. There is no evidence

-40-

and no reasonable juror could find that Novotny's workplace was permeated with discriminatory intimidation or ridicule. In sum, there is no evidence that Novotny's workplace was "permeated with discriminatory intimidation, ridicule, and insult" that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

**C.      Reasonable Care To Prevent and Correct**

Lexis's final argument regarding Novotny's gender harassment claims is that, assuming arguendo that harassment occurred, Lexis exercised reasonable care to prevent and correct harassment. In that regard, Lexis had a "Non Discrimination and Harassment" policy in place. (Novotny Dep. 82, Ex. 10.) Further, employees were trained regarding this policy. (Id.) Finally, when Novotny made her gender discrimination allegation, Lexis promptly investigated. Simpson, who conducted the investigation for Lexis, conducted interviews with Novotny, Roberts and a number of other employees. She also looked into other facts and background information such as personnel documentation and information concerning Robert's and Novotny's employment and performance histories and the CAP. Novotny has presented no evidence or argument to the contrary. Therefore, there is uncontroverted evidence that Lexis exercised reasonable care to prevent and correct gender harassment.

**D.      Conclusion**

Novotny has not presented evidence that, when viewed in a light most favorable to her, satisfies two of the elements of a prima facie case of gender harassment. She has not shown that the actions that she alleges were harassment were based upon her gender. She also has not shown that the actions she alleges were harassment created a Title VII hostile work environment. Finally, assuming arguendo that Novotny could make a prima facie case, which she has not, the

-41-

Defendants have presented the affirmative defense that they exercised reasonable care to prevent and correct gender harassment.

Therefore, there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Novotny's Title VII and Ohio gender harassment claims. Counts III and IV of Novotny's Complaint are DISMISSED.

## VI.    *GENARO* CLAIM

Novotny next alleges that Roberts, as an individual, is jointly and severally liable for the alleged unlawful discrimination and harassment. Under Ohio Rev. Code Chapter 4112 and the Ohio Supreme Court decision in *Genaro v. Central Transport*, 703 N.E.2d 782 (Ohio 1999), a supervisor or manager is considered an "employer" and may be held jointly and severally liable in his or her individual capacity for conduct in violation of Ohio Rev. Code Chapter 4112.

The Defendants respond that Title VII does not provide for individual liability. However, Ohio law apparently does provide for individual liability for violation of Ohio's anti-discrimination statute.

Yet, as determined above, Novotny has not shown that she was unlawfully discriminated against or unlawfully harassed. Her gender discrimination and gender harassment claims have been dismissed. Therefore, there are no genuine issues of material fact and Roberts is entitled to judgment as a matter of law on Novotny's *Genaro* claim. Count V of Novotny's Complaint is DISMISSED.

## VII.    RETALIATION UNDER TITLE VII AND OHIO LAW

Novotny alleges that she was discharged in retaliation for complaining about gender discrimination and harassment. (Compl. ¶¶ 63-71.)  The Defendants respond that Novotny

-42-

cannot show a causal connection between raising allegations of gender discrimination and her termination and, therefore, cannot make a prima facie showing of retaliation. The Defendants also argue that, if Novotny could make a prima facie showing of retaliation, she cannot demonstrate pretext.

**A.       The Law on Retaliation**

Retaliation claims brought pursuant to Ohio law are generally analyzed the same as Title VII claims. *Knox*, 375 F.3d at 456; *Ingram*, 630 N.E.2d at 674. In this case, Novotny has brought a retaliation claim under Title VII in Count VI of her Complaint and a retaliation claim under Ohio Rev. Code § 4112.02 in Count VII of her Complaint. These two claims will, therefore, be analyzed together.

Title VII prohibits discrimination against an employee who opposes a practice made unlawful by Title VII. *Howard*, 70 F.App'x 272, 283 (6th Cir. 2003). An employee may establish a Title VII violation either by presenting direct evidence of retaliation or by raising an inference of retaliation. *Haughton*, 206 F.App'x at 530. In this case, Novotny has not presented direct evidence of retaliation and relies on circumstantial evidence to infer retaliation. Therefore, her claim will be reviewed using the familiar *McDonnell Douglas* burden shifting analysis as set forth above. *McDonnell Douglas*, 411 U.S. at 802.

To establish a prima facie case of retaliation, Novotny must show that (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known by Lexis; (3) Lexis thereafter took adverse employment action against her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Michael*, 2007 WL 2176220 at *8.

-43-

If Novotny makes a prima facie case, she creates a presumption of retaliation which Lexis can rebut by articulating a legitimate, non-discriminatory reason for the adverse employment action. *Haughton*, 206 F.App'x at 530. If Lexis presents a legitimate, non-discriminatory reason for the adverse employment action, Novotny has the burden of showing by a preponderance of the evidence that the legitimate, non-discriminatory reason is a pretext for retaliation.

In this case, the Defendants do not challenge Novotny's ability to satisfy the first three elements of a prima facie case of retaliation. For purposes of this Motion for Summary Judgment, it is assumed that Novotny engaged in protected activity when she complained of gender discrimination. It is also assumed that Novotny's complaints of gender discrimination were known by Lexis. Finally, it is assumed that the termination of Novotny's employment by Lexis was an adverse employment action. The Defendants do, however, challenge whether Novotny can show the fourth element of a prima facie case of retaliation which is a causal connection between the termination of her employment and her complaint of gender discrimination.

**B.      Fourth Prima Facie Element: Causal Connection**

To establish a causal connection, Novotny must produce sufficient evidence from which an inference could be drawn that her termination would not have occurred had she not complained of gender discrimination. *Johannes*, 434 F.Supp.2d at 518 (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). Further, temporal proximity alone is insufficient to create a causal connection. *Michael*, 2007 WL 2176220 at * 9. However, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to create a causal

connection. *Id.*

Novotny first complained of gender discrimination on December 15, 2004, when she wrote a letter to Human Resources indicating why she did not sign the CAP. Included in this letter is the statement, "it [the CAP] appears to be evidence of discrimination because my performance has not changed since my previous boss rated me above average for my 2003 and mid-year 2004 performance reviews." The investigation that ultimately resulted in the termination of Novotny's employment began on January 7, 2005, when Vaughn complained about Novotny's handling of certain expenses. Novotny's employment was terminated on January 14, 2005.

There is a temporal proximity between when Novotny complained of gender discrimination and when she was terminated. However, more than a temporal proximity is needed and Novotny has provided no indicia of retaliatory conduct by Lexis following her complaint of gender discrimination. Also, Novotny has presented no evidence from which an inference could be drawn that her termination would not have occurred had she not complained of gender discrimination.

In an effort to show a causal connection between her gender discrimination allegations and the termination of her employment, Novotny argues that the pattern of retaliatory conduct becomes "patent" once Novotny proposed to Bloebaum that her reporting status be changed. However, this event and the subsequent actions cited by Novotny all occurred before she complained of gender discrimination and could hardly be evidence of retaliation for claiming gender discrimination.

Novotny also argues that the investigation of her gender discrimination allegations take

place "over an undetermined period of time." However, the record indicates that the investigation of Novotny's gender discrimination allegations began on January 7, 2005, and concluded with Bloebaum's meeting with Novotny on January 14, 2005. This can hardly be said to be a unreasonable length of time to thoroughly investigate her complaint.

Also, in a attempt to show that the termination of her employment would not have occurred but for her complaints of gender discrimination, Novotny is critical of the investigation of her expense reporting irregularities. She argues that the expense report investigation starts "within weeks" after her gender discrimination complaint, does not follow company policy regarding an audit, included interviews of only some of her subordinates, fails to interview her previous manager, fails to review all of her expense reports and fails to compare her expense reports to those of any male peer and ends in a week without any conclusion of wrongdoing. However, the expense report investigation started immediately upon receipt of a complaint from one of Novotny's direct-reports and included interviews of all those known to have concerns regarding Novotny's expense reporting practices. Further, there are no reasons, and Novotny has not provided any reasons, why other subordinates and her previous manager should be interviewed and why her expense reports should be compared to those of others. With regard to terminating the investigation within a week, no reason is given as to why it should have taken longer. Finally, with regard to not reaching a conclusion, Bernatz completed the investigation, reported the results to Bloebaum who met with Novotny before reaching a conclusion. This process can hardly be said to be unfair or discriminatory to Novotny.

Novotny also attempts to discredit the investigation of her expense reporting practices by arguing that her expense reporting irregularities were the same as other males who had not been

disciplined. However, as detailed above, Novotny's expense reporting irregularities were different from and much more extensive than the alleged expense reporting irregularities by males that she identifies.

In sum, Novotny has not produced sufficient evidence from which an inference could be drawn that her termination would not have occurred had she not complained of gender discrimination. She has not satisfied the fourth element of a prima facie retaliation claim actionable under Title VII.

**C.      Legitimate, Non Discriminatory Reason**

The Defendants next argue that, if Novotny could make a prima facie case of retaliation, she cannot show that the termination of her employment was a pretext for retaliation. The Defendants must first provide a legitimate, non discriminatory reason for terminating Novotny's employment.

As detailed above, Lexis terminated Novotny's employment because of her improper expense report practices. This is a legitimate, non discriminatory reason for terminating Novotny's employment. Novotny now has the burden of showing that this reason is a pretext for retaliation.

**D.      Pretext**

Pretext can be established by showing (1) that the proffered reason had no basis in fact; (2) that the proffered reason did not actually motivate the adverse employment action; or (3) that the proffered reason was insufficient to motivate the adverse employment action. In this case, Novotny does not specifically identify evidence showing pretext.

The first type of showing consists of evidence that the proffered basis never happened,

that it is factually false. In this case, no evidence is provided that shows that the proffered basis for Lexis's termination of Novotny's employment never happened.

For the second type of showing, the plaintiff admits the factual basis underlying the employer's proffered explanation and admits that such conduct could motivate dismissal but attempts to indict the credibility of the explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the employer. In other words, Novotny must argue that the sheer weight of the circumstantial evidence of retaliation makes it more likely than not that Lexis's explanation is a pretext.

To show pretext in this fashion, Novotny may not rely upon her prima facie case but must instead introduce additional evidence of retaliation. This she has not done. Even if the alleged evidence of retaliation presented by Novotny to make a prima facie showing were considered as "additional evidence", she still has not shown that retaliation was more likely the reason for the termination of her employment than her expense reporting irregularities.

The third type of showing ordinarily consists of evidence that other employees not in the protected class were not retaliated against even though they engaged in substantially identical conduct. In this case, Novotny had not presented evidence that other male employees engaged in substantially the same abuses of the expense reporting system as she did and were not terminated. Therefore, Novotny has not presented evidence that Lexis's legitimate, non discriminatory reason for terminating her employment was a pretext for discrimination.

**E.    Conclusion**

There are no genuine issues of material fact and Novotny has failed to state a prima case of retaliation in connection with her discharge because she has not shown a causal connection

-48-

between her gender discrimination complaint and the termination of her employment. Further, Lexis has articulated a legitimate, non discriminatory reason for terminating Novotny's employment and she has not shown that this reason is a pretext for retaliation. Counts VI and VII of Novotny's Complaint are DISMISSED.

## VIII.   EQUAL PAY ACT

In Count VIII of her Complaint, Novotny alleges Lexis violated the Equal Pay Act ("EPA") by failing to give her a "Senior Director" title when she was hired and by failing to promote her to the "Senior Director" position during her employment. (Compl. ¶¶ 72-77.) The Defendants respond that Novotny cannot make a prima facie showing of a violation of the EPA.

The EPA prohibits employers from paying an employee a lower wage than that paid to employees of the opposite sex for equal work. *Thomas v. Owen Electric Cooperative, Inc.*, 121 F.App'x 598, 603 (6th Cir. 2005) (citing 29 U.S.C. § 206(d)(1)). To make a prima facie case under the EPA, the plaintiff must show that the employer pays different wages to employees of opposite sexes for equal work on jobs which require equal skill, effort and responsibility and which are performed under similar working conditions. *Id.* (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974). Equal work requires substantial, but not necessarily identical, equality of skill, effort, responsibility and working conditions. *Id.* (citing *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981)). Finally, skill includes consideration of such factors as experience, training, education and ability. *Id.* (citing 29 C.F.R. § 1620.15(a)).

If the plaintiff presents a prima facie case of violation of the EPA, the burden shifts to the employer to show that one of four affirmative defenses justifies the difference in pay. *Balmer v. HCA, Inc.*, 423 F.3d 606, 612 (6th Cir. 2005). The affirmative defenses are: (1) a seniority

system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; and (4) a differential based upon any other factor other than sex. *Id.* The employer must show that sex provides no part of the basis for the wage differential. *Id.*

In this case, Novotny has not presented evidence of a prima facie case of violation of the EPA. Although she names individuals that she argues are male peers and she identifies job titles, she presents no evidence regarding the wages received by the alleged peers. Likewise, she presents no evidence that her job requires equal skill, effort and responsibility and is performed under similar working conditions as the jobs of the alleged male peers. In fact, there is evidence that the alleged male peers held different jobs and performed different duties from Novotny and that Novotny admits that her title and role were unique. (Novotny Dep. 55-56, 68-77, 166-67; Roberts Dep. 42-45.)

Novotny argues that her equal pay claim focuses primarily on a failure to promote. However, while she may wish to focus on a failure to promote, she still must satisfy the elements of an EPA claim which she has not done.

Since Novotny has not made a prima facie case, the Defendants need not present an affirmative defense. Therefore, there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Novotny's EPA claim. Count VIII of Novotny's Complaint is DISMISSED.

## IX.    DEFAMATION

Count XI of Novotny's Complaint alleges defamation. The Defendants argue that this claim must be dismissed because it is true, because it is hearsay, and because it is subject to a qualified privilege.

Novotny's defamation claim is based upon an alleged comment by Roberts that she was "sacked for fiddling with her expenses." (Novotny Dep. 233-36.) Novotny admits that she has no personal knowledge of the alleged comment but claims that she heard about it from another employee who, in turn, had heard about it from a third employee. (Id.) Novotny also presents the Affidavit of former Lexis employee Lisa Swartz who attests that she heard from "other management level Lexis Nexis employees" that Novotny had been "sacked for fiddling her expenses." (Swartz Aff. ¶ 10.)

Defamation is a "false publication that injures a person's reputation, exposes him to public hatred, contempt, ridicule, shame or disgrace, or affects him adversely in his trade or business." *Knox*, 375 F.3d at 460 (quoting *Sweitzer v. Outlet Communications, Inc.*, 726 N.E.2d 1084 (Ohio Ct. App. 1999)). Ohio law provides a defense to a defamation claim of qualified privilege. *Id.* A qualified privilege exists where the publisher and the recipient have a common interest and the communication is a kind of communication reasonably calculated to protect or further the common interest. *Id.* Once a defendant demonstrates a qualified privilege, the plaintiff can only prevail upon a showing of actual malice. *Id.* Finally, truth is a complete defense to a claim for defamation. *Ed Scar & Sons, Inc. v. Society National Bank*, 662 N.E.2d 1074, 1083 (Ohio 1996).

In this case, Novotny's employment was terminated due to expense reporting irregularities and she has not shown otherwise. Therefore, the alleged defamatory statement is true and the Defendants have a complete defense. Whether Novotny's defamation evidence is hearsay or whether the alleged statement is subject to a qualified privilege need not be and is not addressed.

There are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Novotny's defamation claim. Count XI of Novotny's Complaint is DISMISSED.

## X.    PUBLIC POLICY TORT

Count XII of Novotny's Complaint is for discrimination, retaliation, gender harassment and wrongful discharge in violation of Ohio public policy. (Compl. ¶¶ 90-93.) The Defendants argue that this claim must be dismissed because Title VII and Ohio law already provide statutory remedies for discrimination, retaliation, gender harassment and wrongful discharge based upon discrimination.

Ohio recognizes the common-law doctrine of employment at will. *Wiles v. Medina Auto Parts*, 773 N.E.2d 526, 529 (Ohio 2002). Under this doctrine, employment is terminable at the will of either the employee or the employer. *Id.* Therefore, the discharge of an "at-will" employee does not give rise to an action for damages. *Id.*

However, the Supreme Court of Ohio has created an exception to the employment-at-will doctrine. *Id.* Ohio now recognizes a cause of action in tort for wrongful discipline or discharge in violation of public policy. *Id.* This exception applies when the wrongful discipline or discharge violates public policy found in an Ohio statute or other sources such as "the Constitutions of Ohio and the United States, administrative rules and regulations, and the common law." *Id.*

The four elements of an Ohio common-law claim for wrongful discipline or discharge in violation of public policy are:

1. Clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element);

2. dismissing employees under circumstances like those involved in the plaintiff's

dismissal would jeopardize the public policy (the jeopardy element);

3. the Plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and

4. the employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*Id.* at 529-30 The Ohio Supreme Court has also determined that the clarity and jeopardy elements are questions of law to be decided by the court and factual issues relating to the causation and overriding-justification elements are generally for the trier of fact to resolve. *Id.*

Having established the tort and its elements, the Ohio Supreme Court then turned to an analysis of the elements. In its analysis of the jeopardy element, the Court found that, where "the sole source of the public policy opposing the discharge is a statute that provides substantive right and remedies for its breach, the issue of adequacy of remedies becomes a particularly important component of the jeopardy analysis." *Id.* at 531. The Court concluded that, "there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests." *Id.*

In this case, Title VII and Ohio's Civil Rights Law, Ohio Rev. Code. § 4112 et seq., are presumably the source of the public policy under which Novotny brings her public policy tort claim. Further, Title VII and Ohio's Civil Rights Law, Ohio Rev. Code. § 4112 et seq. provide adequate remedies for Novotny's claims of discrimination, retaliation, gender harassment and wrongful discharge. *See Carrasco v. NOAMTC Inc.*, 124 F.App'x 297, 304 (6th Cir. 2004). Therefore, Novotny cannot satisfy the jeopardy element of a Ohio public policy tort claim.

There are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on her Ohio public policy tort claim. Count XII of Novotny's Complaint is

DISMISSED.

## XI.    SUMMARY

Novotny's Motion To Strike the investigation notes is OVERRULED. Bernatz's and Simpson's investigation notes are admissible to show that there were complaints, to show that the complaints were investigated by interviewing certain employees and reviewing certain records and to show the state of mind and motivation of the investigators in reaching their conclusions. However, any hearsay statements included in the investigation notes are not admissible for the truth of the matter asserted.

Counts I and II of Novotny's Complaint for gender discrimination are dismissed because she has failed to state a prima facie case of gender discrimination in connection with her discharge and in connection with the actions taken prior to her discharge. Further, there are legitimate, non discriminatory reasons for both and Novotny has not shown that these legitimate, non discriminatory reasons were a pretext for discrimination.

Counts III and IV of Novotny's Complaint for gender harassment are dismissed because she has failed to state a prima facie case of gender harassment and because the Defendants have shown that they exercised reasonable care to prevent and correct gender harassment. Also, Novotny's *Genaro* claim against Roberts, Count V, is dismissed because she has not shown that she was unlawfully discriminated against or unlawfully harassed.

Counts VI and VII of Novotny's Complaint for retaliation are dismissed because she has failed to state a prima case of retaliation in connection with her discharge. Further, Lexis has articulated a legitimate, non discriminatory reason for terminating Novotny's employment and she has not shown that this reason is a pretext for retaliation.

Count VIII of Novotny's Complaint for violations of the Equal Pay Act is dismissed because she has failed to state a prima facie case of violation of the Equal Pay Act. Also, Counts IX and X of Novotny's Complaint have previously been dismissed.

Count XI of Novotny's Complaint for defamation is dismissed because the alleged defamatory statement is true and truth is a complete defense to a defamation claim. Finally, Count XII of Novotny's Complaint of a public policy tort is dismissed because Title VII and Ohio's Civil Rights Law, Ohio Rev.Code. § 4112 et seq. provide adequate remedies for Novotny's claims of discrimination, retaliation, gender harassment and wrongful discharge.

There are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on Counts I, II, III, IV, V, VI, VII, VIII, XI and XII of Novotny's Complaint. The Defendants Motion for Summary Judgment is GRANTED. The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

DONE and **ORDERED** in Dayton, Ohio, this Tenth day of September, 2007.

**s/Thomas M. Rose**

_____

THOMAS M. ROSE
UNITED STATED DISTRICT JUDGE

Copies furnished to:

Counsel of Record